## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CASANDRA S.,                        )
                                    )
            Plaintiff,              )
                                    )
    v.                              )        1:22CV152
                                    )
KILOLO KIJAKAZI,                    )
Acting Commissioner of Social       )
Security,                           )
                                    )
            Defendant.              )

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Casandra S., brought this action pro se pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 2.) The Commissioner has filed the certified administrative record (Docket Entry 11 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 17, 20; see also Docket Entry 2-2 at 6-7 (attachment to Plaintiff's Complaint containing medical records); Docket Entry 15 (Plaintiff's untitled filing containing medical records); Docket Entry 18 (Plaintiff's Brief); Docket Entry 19 (attachment to Plaintiff's Brief containing medical records); Docket Entry 21

(Commissioner's Memorandum)).  For the reasons that follow, the Court will enter judgment for the Commissioner.[1]

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI (Tr. 250-63), alleging a disability onset date of February 12, 2018 (see Tr. 250, 257). Upon denial of those applications initially (Tr. 86-113, 146-50) and on reconsideration (Tr. 114-45, 155-72), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 173-74).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 45-85.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 16-39.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-5, 240-49), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1.    [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2021.

2.    [Plaintiff] has not engaged in substantial gainful activity since February 12, 2018, the alleged onset date.

. . .

---

[1] On consent of the parties, this "case [wa]s referred to [the undersigned] United States Magistrate Judge . . . to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings therein." (Docket Entry 16 at 1.)

3.  [Plaintiff] has the following severe impairments:
Laceration injury to dominant hand, status post tendon
and nerve surgical repair; Hypothyroidism; Major
Depressive Disorder; Generalized Anxiety Disorder.

. . .

4.  [Plaintiff] does not have an impairment or
combination of impairments that meets or medically equals
the severity of one of the listed impairments in 20 CFR
Part 404, Subpart P, Appendix 1.

. . .

5.  . . . [Plaintiff] has the residual functional
capacity to perform light work . . . except she is able
to frequently climb ramps and stairs, but never ladders
or scaffolds.  She is able to frequently stoop and crawl.
She is able to occasionally handle, finger, and feel with
the dominant hand.  She is able to understand, recall and
carry out simple, routine tasks involving no more than
simple, short instructions and simple work-related
decisions.

. . .

6.  [Plaintiff] is unable to perform any past relevant
work.

. . .

10.  Considering [Plaintiff]'s age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [Plaintiff] can perform.

. . .

11.  [Plaintiff] has not been under a disability, as
defined in the . . . Act, from February 12, 2018, through
the date of this decision.

(Tr. 22-38 (bold font and internal parenthetical citations
omitted).)

3

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the

4

case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u>

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award

---

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65.  If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled.  <u>Hines</u>, 453 F.3d at 567.[5]

## B.  Assignments of Error

After affording Plaintiff's Complaint (Docket Entry 2), Motion for Judgment (Docket Entry 17), and supporting documents (Docket Entries 2-2 at 6-7; <u>see also</u> Docket Entries 15, 18, 19) the liberal construction due such pro se filings, <u>see</u> <u>Hill v. Braxton</u>, 277 F.3d 701, 707 (4th Cir. 2002) (citing <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972)), the Court will construe Plaintiff's assignments of error as the following:

1) the ALJ erred by finding that "[Plaintiff]'s laceration injury to [her] right hand status post tendon and nerve surgical repair d[id] not meet [L]isting 1.08 regarding soft tissue injury" (Docket Entry 2 at 3; <u>see also</u> Docket Entry 17 at 2; Docket Entry 18 at 1, 2); and

_____

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

2) "[Plaintiff] meets several of the [Listings]" (Docket Entry 17 at 2), including "Digestive System" (id.), "Hematological [Disorders]" (id.), "Skin Disorders" (id. at 3), "Endocrine Disorder[s]" (id.), and "Mental Disorders" (id. at 4; see also Docket Entry 2 at 3-4; Docket Entry 18 at 1-2).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (See Docket Entry 21 at 4-12.)

### 1. Listing 1.08

In Plaintiff's first issue on review, she asserts that the ALJ erred by finding that "[Plaintiff]'s laceration injury to [her] right hand status post tendon and nerve surgical repair d[id] not meet [L]isting 1.08 regarding soft tissue injury." (Docket Entry 2 at 3; see also Docket Entry 17 at 2; Docket Entry 18 at 1, 2.) In that regard, Plaintiff notes that "[she] presented imaging results to [the A]ppeals [C]ouncil" (Docket Entry 18 at 1 (referencing Docket Entry 2 at 5 (x-ray of Plaintiff's right hand dated Jan. 11, 2022)))[6] as well as that her hand surgeon, Dr.

_____

[6] Although Plaintiff claims she submitted her right-hand x-ray to the Appeals Council (see Docket Entry 18 at 1), the x-ray bears the date of January 11, 2022 (see Docket Entry 2 at 5), and the Appeals Council denied review of the ALJ's decision on December 22, 2021 (see Tr. 1-5). Plaintiff's request for review does contain a letter from Plaintiff to the Appeals Council dated October 5, 2021, "request[ing] an extension of time for additional evidence of a [d]isability [a]pproved [m]edical [d]octor ex-ray [sic] of [her] hand" (Tr. 244), as well as a response from the Appeals Council dated November 17, 2021, informing Plaintiff that the Appeals Council "w[ould] not act for 25 days" (Tr. 6 (bold font omitted)), but that, if the Appeals Council "d[id] not hear from [Plaintiff] within 25 days, [it] w[ould] assume that [she] d[id] not want to send [in] more information" (id.). The record does not reflect further correspondence from Plaintiff to the Appeals Council. More significantly, however, the hand x-ray would not have provided the Appeals Council with a basis to grant review, as the x-ray post-dates the ALJ's decision by over 14 months and therefore does not relate to the period before the ALJ's decision. (See Tr. 1-2 (advising Plaintiff

Walter Harold Wray III, opined on March 30, 2022, that Plaintiff's "hand is what it is," that "[n]o further surgery would be beneficial," and that "[i]t [wa]s unlikely that she w[ould] be able to return to her previous level of work" (id. (quoting Docket Entry 19 at 3)). Plaintiff's contentions fail to warrant relief.

"Under Step 3, the [SSA's SEP] regulation states that a claimant will be found disabled if he or she has an impairment that 'meets or equals one of [the] listings in appendix 1 of [20 C.F.R. Pt. 404, Subpt. P] and meets the duration requirement.'" Radford v. Colvin, 734 F.3d 288, 293 (4th Cir. 2013) (quoting 20 C.F.R. § 404.1520(a)(4)(iii)) (internal bracketed numbers omitted). "The listings set out at 20 CFR pt. 404, subpt. P, App. 1, are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (internal footnote and parentheticals omitted). "In order to satisfy a listing and qualify for benefits, a person must meet all of the medical

---

that Appeals Council will review case if it "receive[s] additional evidence that [Plaintiff] show[s] is new, material, and relates to the period on or before the date of the hearing decision" (emphasis added)).) The x-ray also would not have shown a reasonable probability of changing the outcome of the ALJ's decision (see Tr. 2 (listing such "reasonable probability" as additional requirement for new evidence to serve as basis for granting review)), because the x-ray merely showed the presence of "[s]table small radiopaque foreign bodies in the soft tissues about the proximal aspect of the palmar surface" of Plaintiff's right hand (Docket Entry 2 at 5 (emphasis added)), and did not provide any functional limitations arising out of the residuals of her laceration injury (see id.).

criteria in a particular listing." Bennett v. Sullivan, 917 F.2d 157, 160 (4th Cir. 1990) (citing Zebley, 493 U.S. at 530, and 20 C.F.R. 404.1526(a)); see also Zebley, 493 U.S. at 530 ("An impairment that manifests only some of those criteria [in a listing], no matter how severely, does not qualify.").

To satisfy the criteria of Listing 1.08, Plaintiff must show that she meets or equals the following requirements:

> Soft tissue injury (e.g., burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in [Section] 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.08 (italics omitted).[7]

Here, the ALJ found at step three of the SEP as follows:

> [Plaintiff]'s laceration injury to dominant hand, status post tendon and nerve surgical repair does not meet [L]isting 1.08, regarding soft tissue injury . . . . [T]here is no evidence of a soft tissue injury of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in [Section] 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset.

---

[7] "Although Listing 1.08 does not define 'soft tissue injury,' . . . [a]t least one dictionary defines 'soft tissue injury' as:

> . . . injury in the form of sprains, strains, contusions, lacerations, bruises, hematomas, cuts, abrasions, scrapes, scratches, and tears confined to the muscles, tendons, ligaments, cartilages, nerves, fibers, veins, arteries and skin of the human body.

The Sloane-Dorland Annotated Medical-Legal Dictionary 381 (1987)."

Cranmer v. Astrue, No. CIV. A. 07-11386, 2008 WL 3084706, at *4 (D. Mass. Aug. 5, 2008) (unpublished) (emphasis added).

11

(Tr. 23 (emphasis added).)  For the reasons more fully explained below, the ALJ did not err in finding that Plaintiff's right hand laceration injury and surgical repair failed to meet or medically equal the criteria of Listing 1.08.

a.  Continuing Surgical Management

Section 1.00M defines "continuing surgical management" as "surgical procedures and <u>any other associated treatments</u> related to the efforts directed toward the salvage or restoration of functional use of the affected part," and "may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy."  <u>Id.</u>, § 1.00M.  Courts have recognized that undergoing post-surgical occupational or physical therapy directed at restoration of function to the affected body part qualifies as "continuing surgical management," <u>see, e.g.</u>, <u>Murray v. Commissioner of Soc. Sec.</u>, No. 13CV1336, 2014 WL 4199725, at *14 (E.D.N.Y. Aug. 21, 2014) (unpublished) ("[The p]laintiff underwent a single surgery in January 2008. . . .  However, the record does show that [the p]laintiff received rehabilitation therapy and that such therapy was part of her post-operative plan . . . .  In January 2009, [a doctor] advised [the p]laintiff to continue with physical therapy.  Arguably, [the p]laintiff's rehabilitation is an "associated treatment[ ] related to the efforts directed toward the

12

salvage or restoration of functional use of the affected part." 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00(M)." (internal parenthetical citations omitted)).

Here, Plaintiff sustained a laceration injury of her right, dominant hand on January 18, 2018 (see Tr. 720-24), and underwent surgical median nerve and tendon repair on February 13, 2018 (see Tr. 703-09). Plaintiff's post-operative follow-up visits did not reflect that she experienced any surgical complications or infections, and her surgeon did not recommend further surgeries. (See Tr. 616-17, 644, 692-93.) Following that surgery, Plaintiff attended 28 occupational therapy sessions from February 16, 2018, to September 11, 2018, directed at restoring function to her right hand (see Tr. 607-701). Nearly three months later on December 6, 2018, Plaintiff attended a final occupational therapy session (see Tr. 830-34) for "final follow up and recheck of her grip strength and [range of motion ('ROM')]" (Tr. 831). No further treatment for Plaintiff's right hand appears in the record. (See Tr. 835-1287.)

Thus, even including Plaintiff's occupational therapy sessions as "continuing surgical management," she did not remain under "continuing surgical management" for a full 12 months and thus cannot meet that requirement of Listing 1.08. See Stephanie S. v. Kijakazi, No. 3:20CV1557, 2022 WL 2105870, at *4 (N.D.N.Y. June 10, 2022) (unpublished) (finding, where the plaintiff "concededly underwent several surgeries," but "complet[ed] physical

13

therapy . . . roughly seven months after her initial injury," that "record d[id] not demonstrate that she experienced continued surgical intervention without improvement over a twelve-month period" and, thus, that "she c[ould ] not show she met the requirements of Listing 1.08"); <u>Owens v. Kijakazi</u>, No. 20CV2075, 2022 WL 291895, at *6 (N.D. Iowa Jan. 14, 2022) (unpublished) (". . . [A]fter the accident on April 23, 2017, [the plaintiff] was hospitalized for more than two months and underwent multiple skin graft and debridement surgeries. She was discharged to outpatient follow-up in late June 2017. By mid-August 2017, three areas of her left leg had still not fully healed, and another debridement procedure was performed at the wound clinic. A few days later, [she] fell getting into the car and hit her left leg, which further opened her wound and required stitches at the emergency room. The stitches did not help. [She] was seen in follow-up at the wound clinic on August 24, September 7, September 26, and October 24; debridements were performed at each appointment. Her last appointment with the wound clinic was on November 30, 2017. The provider noted that all wounds had healed and closed and that [the plaintiff] required no ongoing wound care or dressing. [The plaintiff] was discharged from the wound clinic with no follow-up appointments scheduled. After that, the only treatment notes in the record are from [the plaintiff]'s primary care physician for pain management. [The plaintiff] did not require continuing

14

surgical or medical care for her degloving injury. The record does not support that [the plaintiff] was under 'continuing surgical management' such that her impairments met or equaled Listing 1.08." (internal citations omitted)), recommendation adopted sub nom. Owens v. Commissioner of Soc. Sec., 2022 WL 298648 (N.D. Iowa Jan. 31, 2022) (unpublished); Luigi B. v. Saul, No. 18CV7392, 2021 WL 83508, at *7 (N.D. Ill. Jan. 11, 2021) (unpublished) ("Certainly the fact that [the plaintiff] was discharged from occupational therapy [less than three months after right wrist tendon release surgery] and recommended to continue with only home exercise to resolve his symptoms is probative of the fact that [he] was n[ot] under 'continuing surgical management' . . . ."); Wasilauskis v. Astrue, No. CIV. 08-284, 2009 WL 861492, at *6 (D. Me. Mar. 30, 2009) (unpublished) ("The plaintiff sustained a severe left-hand degloving injury in an automobile accident on April 23, 2002, during which his hand was dragged between the car window and the asphalt. He lost tissue, tendons, and even part of the bone of the hand. Following initial surgery, he underwent further reconstructive surgery on August 19, 2002. He thereafter discussed with his hand surgeon the possibility of further reconstructive surgery in the form of tendon transfers. However, the record contains no indication that any further surgery ever was performed. Despite the plaintiff's lack of extension, for which tendon transfers were contemplated, and his somewhat thickened scars in

15

his fourth web space, his hand surgeon noted on September 9, 2003, that [the plaintiff] was otherwise using his injured left hand relatively normally. His hand was not 'under continuing surgical management' for purposes of Listing 1.08." (internal brackets, parenthetical citations, and some quotation marks omitted)), recommendation adopted, 2009 WL 1078362 (D. Me. Apr. 21, 2009) (unpublished); Graham v. Astrue, No. CIV.A. 1:07-00715, 2009 WL 915662, at *4 (S.D.W. Va. Mar. 30, 2009) (unpublished) ("[The plaintiff] injured his left wrist on July 19, 2004, and underwent a first surgical procedure on November 29, 2004. He developed a staph infection on December 5, 2004, and underwent additional surgery on December 8, 2004. [The plaintiff]'s treating orthopedist . . . noted on May 24, 2005, that there were no signs of infection and that his wound was well-healed. Thus, it appears that [the plaintiff]'s 'continuing surgical management' ceased at the latest, on May 24, 2005, which was only ten months from the date of his injury. Accordingly, it does not appear that [the plaintiff] meets the requirements of Listing § 1.08.").

b.   Restoration of Major Function

The regulations do not define "major function," see Murray, 2014 WL 4199725, at *12 ("'Major function' is not defined under the SSA regulations."); however, "courts have looked to the [regulatory] definition of 'functional loss[]'" to "evaluat[e] whether an individual's major function has been restored under

16

Listing 1.08," id.; see also Wagers v. Kijakazi, No. CV 6:21-026, 2021 WL 6010330, at *6 (E.D. Ky. Dec. 16, 2021) (unpublished) ("Courts have considered [the regulations' definition of] 'functional loss' in determining whether an individual's major function was impaired and restored."); Lopez v. Berryhill, 448 F. Supp. 3d 328, 351 (S.D.N.Y. 2020) (". . . [T]o evaluate whether an individual's 'major function' has been restored for purposes of Listing 1.08, courts have looked to whether a claimant suffers from 'functional loss' as defined by 20 C.F.R. Part 404, Subpart P, Appendix 1[,] § 1.00(B)(1)."); Kiernan v. Astrue, No. 12CV459, 2013 WL 2323125, at *6 (E.D. Va. May 28, 2013) (unpublished) ("For the ALJ to determine whether a claimant meets Listing 1.08, [the ALJ] must determine whether major function was restored or expected to be restored within 12 months from onset. Necessarily, he must determine in the first instance whether there was a 'loss of function' before he can decide whether such function was restored." (internal citation omitted)).

Functional loss "for purposes of the[ musculoskeletal disorders] listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment." 20 C.F.R. Pt. 404, Subpt.

P, App'x 1, § 1.00(B)(2)(a) (emphasis added). "Because Plaintiff suffers from an impairment of the upper extremity, Plaintiff's ability to ambulate effectively is not at issue[, and t]he Court focuses instead on whether Plaintiff lacks the ability to perform fine and gross movements." Murray, 2014 WL 4199725, at *12 (footnote omitted); see also Kiernan, 2013 WL 2323125, at *6 n.9 (". . . [A] 'loss of function' c[an ] result from an 'inability to perform fine and gross movements effectively on a sustained basis.' 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(B)(2)(a)."); Corchado v. Astrue, No. 12CV52, 2013 WL 324022, at *5 (D.N.H. Jan. 29, 2013) (unpublished) ("For purposes of Listing 1.08, loss of a major function includes the inability to . . . perform fine and gross movements."); Howl v. Astrue, No. 2:08CV38, 2011 WL 91130, *14 (M.D. Tenn. Jan. 10, 2011) (unpublished) ("The necessary functional loss that is required by Listing 1.08, as defined by the [r]egulations, includes the 'inability to perform fine and gross movements effectively . . . [which] must have lasted, or be expected to last for at least 12 months.'").

In turn, the regulations define inability to perform fine and gross movements as:

> [A]n impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively

18

include, but are not limited to, the inability to prepare
a simple meal and feed oneself, the inability to take
care of personal hygiene, the inability to sort and
handle papers or files, and the inability to place files
in a file cabinet at or above waist level.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00(B)(2)(c).

Applying the above-quoted criteria to Plaintiff's factual
circumstances, the Court finds that substantial evidence supports
the ALJ's determination that the record lacked evidence that "major
function [of Plaintiff's right hand] was not restored or expected
to be restored within 12 months of onset" (Tr. 23). In that
regard, the ALJ summarized Plaintiff's treatment for her right hand
injury (see Tr. 27-29), observed that her "right hand laceration
seemed to respond well to surgery and occupational therapy," as
well as that Plaintiff "could mostly make a fist and [] use her
fingers" (Tr. 34), and found that "[a]ny limitations from
[Plaintiff's] laceration injury . . . would be appropriately
covered by the light [RFC ] and additional manipulative and
postural restrictions" (Tr. 29).

Indeed, Plaintiff's occupational therapy records show that, by
March 2018, she regained the ability to extend her wrist (see Tr.
685, 676, 674), used her middle finger's flexor digitorum profundus
("FDP") tendon for the first time (see Tr. 675), and made gains in
finger flexion (see Tr. 659, 666). By April 2018, Plaintiff
demonstrated a significant increase in motion of her ring and small
fingers (see Tr. 655-56), decreased swelling (see Tr. 655),

19

improved hypersensitivity (see id.), the ability to oppose her thumb to all fingers (see Tr. 654), and the ability to use scissors (see Tr. 651) and to continue working as a hairdresser (see Tr. 648). At the end of May 2018, Plaintiff reported that she could perform most work tasks (see Tr. 640), her therapist described Plaintiff's ROM as "near full" (Tr. 634), and Plaintiff could make a functional fist with her fingertips about one centimeter from her palm (see id.). During the month of June 2018, Plaintiff indicated that she continued to work, that using curlers "was getting easier," and that she could "squeeze a bottle and get it to spray." (Tr. 631.) In July 2018, Plaintiff regained the ability to actively flex her thumb and make an "O" during opposition (Tr. 621), and her therapist measured Plaintiff's grip strength as 21 pounds on the right versus 55 pounds on the left (see Tr. 619). By August 2018, Plaintiff could touch her fingertips all the way to her palm (see Tr. 610), and her therapist deemed Plaintiff's thumb within functional limits (see Tr. 611). At Plaintiff's second-to-last occupational therapy visit in September 2018, Plaintiff reported 0 out of 10 pain (see Tr. 607) and, at her last visit in December 2018, her right grip strength had improved to 26 pounds (see Tr. 832), and she could manipulate putty with ease, fully extend her fingers, and make a functional fist (see Tr. 831).

Regarding Plaintiff's ability to engage in activities of daily living ("ADLs"), the ALJ found as follows:

20

> . . . [Plaintiff] is able to independently care for her
> [ADLs]. [Plaintiff] is able to drive a car. She shops
> in stores. She is able to handle money. She goes to
> church, watches television, reads, and watches YouTube
> videos. Furthermore, [she] testified that she was able
> to live alone. She was able to make her bed, use a small
> vacuum, and do laundry (other than carrying it upstairs).
> Here, [Plaintiff] has described [ADLs] that are
> inconsistent with [her] allegations of disabling symptoms
> and limitations.

(Tr. 34-35 (internal parenthetical citations omitted).)
Plaintiff's ability to perform these varied ADLs, together with the
significant functional gains she achieved in occupational therapy,
provide substantial evidence to support the ALJ's finding that
Plaintiff had not shown the loss of hand function required by
Listing 1.08 (see Tr. 23). See Taryn R. M. v. Saul, No. 2:19CV567,
2020 WL 6709557, at *4 (D. Me. Nov. 15, 2020) (unpublished)
("[Section] 1.00B(2)(c) makes clear that an ability to bathe, cook
a meal, and wash dishes is inconsistent with a finding that a
claimant has suffered the functional loss required to meet [a
similar listing requiring inability to perform fine and gross
movements].", recommendation adopted, 2021 WL 1082531 (D. Me. Mar.
19, 2021) (unpublished); Goodwin v. Astrue, No. 10CV233, 2011 WL
1630927, at *11 (D.N.H. Apr. 11, 2011) (unpublished) (holding that
ALJ did not err in finding the plaintiff had failed to demonstrate
inability to perform fine and gross movements, where he remained
able to drive, pay bills, use a checkbook, buy groceries, collect
coins, take care of laundry, cook, shop, and clean).

21

In sum, Plaintiff's first issue on review does not establish a basis for relief.

## 2. Other Listings

In Plaintiff's second and final assignment of error, she contends that "[she] meets several of the [Listings]" (Docket Entry 17 at 2), including "Digestive System" (id.), "Hematological [Disorders]" (id.), "Skin Disorders" (id. at 3), "Endocrine Disorder[s]" (id.), and "Mental Disorders" (id. at 4; see also Docket Entry 2 at 3-4; Docket Entry 18 at 1-2). Plaintiff, however, fails to identify a single, specific Listing that she believes her impairments meet. (See Docket Entry 17 at 2-4; see also Docket Entries 2, 18.) For the following reasons, those arguments fall short.

a. Digestive System

Plaintiff contends that she meets an unidentified digestive system Listing, because she "was diagnosed with [irritable bowel syndrom ('IBS')] with constipation prior to [her] hand injury," that her IBS medications consisted of Linzess and omeprazole, and that she "experiences heartburn, gas[, ] constant constipation[, and] . . . fatigue." (Docket Entry 17 at 2.) Plaintiff's contention overlooks the fact that the ALJ found Plaintiff's IBS a non-severe impairment at step two of the SEP. (See Tr. 22.) In support of that finding, the ALJ noted that Plaintiff "reported symptoms of gas, flatus, and constipation," and that "[s]ome of

22

th[at] was relieved by the medication[] Linzess." (Id.)
Significantly, the ALJ found that Plaintiff's IBS "w[as] being
managed medically, and [that] the longitudinal medical record
show[ed] th[at her IBS] did not cause any ongoing functional
limitations," and that "no aggressive treatment was recommended or
anticipated for [her IBS]." (Id. (emphasis added).) As Plaintiff
has not shown that the ALJ's non-severity finding lacks the support
of substantial evidence, she cannot establish that her IBS meets or
medically equals the more stringent requirements of a Listing.

b.  Hematological Disorders

    In support of Plaintiff's contention that she meets an
unidentified listing for a hematological disorder, she points out
that, "[s]ince [her] last hearing [in] June 2020, she has had [t]wo
[b]lood transfusions and 10 [iron] infusions." (Docket Entry 17 at
2 (emphasis added); see also Docket Entry 15 at 2-8 (medical
records reflecting transfusions and infusions from July 30, 2020,
to Aug. 11, 2022); Docket Entry 18 at 1 (noting that Plaintiff
suffers from "heavy menstrual cycles" and "severe iron deficiency
anemia," as well as that she "has received [b]lood [t]ranfusion[s]
on 07/23/2020[,] . . . 12/02/2021, . . . [and] 05/24/22" and "[iron
i]nfusion[s] on 03/25/2021, 04/01/2021, 11/08/21,
11/15/21, . . . 05/27/2022, 06/03/2022, 07/13/2022, 07/26/2022,
08/04/2022, [and] 08/11/2022").)

23

Plaintiff's arguments fail, because they rely upon medical records that post-date the ALJ's decision, and that Plaintiff submitted neither to the ALJ during the post-hearing/pre-decision period nor to the Appeals Council. "[I]n determining whether the ALJ's decision is supported by substantial evidence, [this C]ourt cannot consider evidence which was not presented to the ALJ [or the Appeals Council]." Smith v. Chater, 99 F.3d 635, 638 n.5 (4th Cir. 1996). Instead, the Court can remand the case under sentence six of 42 U.S.C. § 405(g)[8] for the Commissioner to consider the new evidence, if Plaintiff can satisfy the following four requirements:

> First, the claimant must demonstrate that the new evidence is relevant to the determination of disability at the time the claimant first applied for benefits and is not merely cumulative of evidence already on the record. Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985) (citing Mitchell v. Schweiker, 699 F.2d 185, 188 (4th Cir. 1983)). Second, the claimant must establish that the evidence is material, in that the Commissioner's decision "'might reasonably have been different' had the new evidence been before her." Id. (quoting King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)). Third, the claimant must show that good cause exists for her failure to present the evidence earlier. Id. And fourth, the claimant must present to the reviewing court "'at least a general showing of the nature' of the new evidence." Id. (quoting King, 599 F.2d at 599).

Finney v. Colvin, 637 F. App'x 711, 715-16 (4th Cir. 2016).

The Court will not order a sentence six remand on the basis of this new evidence, because Plaintiff has failed to show that the

---

[8] Sentence six of 42 U.S.C. § 405(g) provides that a court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).

new evidence qualifies as material.  The notes from Plaintiff's transfusions and infusions all post-date the ALJ's decision, <u>see Brande v. Kijakazi</u>, No. 1:21CV48, 2022 WL 3646002, at *4 (M.D.N.C. Aug. 24, 2022) (unpublished) (Peake, M.J.) ("Implicit in the requirement of materiality is the requirement that the new evidence [] relate to the time period previously considered by the ALJ."), <u>recommendation adopted</u>, 2022 WL 4386711 (M.D.N.C. Sept. 22, 2022) (unpublished) (Biggs, J.), <u>appeal dismissed</u>, No. 22-2197, 2023 WL 3568169 (4th Cir. Jan. 30, 2023) (unpublished), and reflect treatment, i.e., blood transfusions and iron infusions, that Plaintiff <u>did not receive</u> during the relevant period before the ALJ.  Those circumstances preclude a finding that the new evidence relates back to the period prior to the ALJ's decision.  <u>See Campbell v. Astrue</u>, No. 2:11CV563, 2013 WL 1213057, at *8 (E.D. Va. March 1, 2013) (unpublished) ("New evidence must relate to the determination of disability at the time the application was first filed, or at least before the ALJ renders his decision, and it must not contain evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition.").

c.   <u>Skin Disorders</u>

Plaintiff next maintains that she meets the requirements of an unidentified skin disorder Listing, because she "has severe acne from acquired [h]ypothyroidism" and "severe allergies last tested

[on] 12-30-2019." (Docket Entry 17 at 3.) According to Plaintiff, her "allergies also contribute to her skin disorders," and "[a]llergy shots were recommended" but, "[d]ue to loss of insurance, she was unable to complete the shots" and, instead, "takes over the counter allergy pills." (Id.) Plaintiff further notes that she "experiences facial irritations such as burning, itching, swelling, breakouts and hyperpigmentation." (Id.; see also Docket Entry 19 at 5-6 (12/30/19 allergy testing).)

The Listings for Skin Disorders include "Ichthyosis," "Bullous disease," "Chronic infections of the skin or mucous membranes," "Dermatitis," "Hidradenitis suppurativa," "Genetic photosensitivity disorders," and "Burns." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 8.02 - 8.08. Listings 8.02 through 8.07 require "extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed," id., §§ 8.02 - 8.07, and Listing 8.08 requires "extensive skin lesions that have lasted or can be expected to last for a continuous period of at least 12 months," id., § 8.08. Plaintiff has made no effort to show how her acne or allergies meet or medically equal the requirements of any of those listings (see Docket Entry 17 at 3) and, notably, she did not even mention acne or allergies as disabling conditions at the time of her applications (see Tr. 87, 100, 115, 130) or during the hearing

(see Tr. 45-85).[9]  Consistent with those omissions, the ALJ did not

find that Plaintiff's acne or allergies constituted even medically

determinable impairments.   (See Tr. 22.)   Plaintiff has not

established error regarding the skin disorder Listings.

d.   Endocrine Disorders

     Concerning the endocrine disorders Listings, Plaintiff asserts

as follows:

> [Plaintiff] has acquired [h]ypothyroidism, [t]hyroid
> nodes and goiter . . . [and] was seen for several years
> every 3 months until the hand injury.  After [the] hand
> injury, [Plaintiff] could not work and lost her
> insurance.  [In] August of 2018, she was hospitalized at
> Old Vineyard Mental Health Clinic, . . . [and the r]eason
> for admission [was d]epression.  Thyroid [Stimulating
> Hormone ('THS') l]evel[] was 8.82[.  M]edication was
> adjusted from [l]evothyroxine 75 [mcg] to [l]evothyroxine
> 112 [mcg].  Currently, [Plaintiff's] medi[c]ation is
> Synthroid 112 [mcg].  She experiences fatigue, lethargy,
> sensitivity to cold, hair loss, brittle nails,
> constipation, enlarged thyroid, irritability, slow heart
> rate, sluggishness, [and] irregular uterine bleeding.

(Docket Entry 17 at 3.)

     The ALJ found Plaintiff's hypothyroidism a severe impairment

at step two of the SEP (see Tr. 22), and then provided the

following analysis of that impairment at step three:

> Although thyroid gland disorders are not considered under
> a specific listing, they affect the sympathetic nervous
> system and normal metabolism and are evaluated under
> thyroid-related changes in blood pressure and heart rate
> that cause arrhythmias or other cardiac dysfunction under
> 4.00;  thyroid-related weight loss under 5.00;
> hypertensive cerebrovascular accidents (strokes) under

---

[9] Plaintiff's attorney conceded at the hearing that none of Plaintiff's
impairments met or medically equaled any of the Listings.  (See Tr. 53.)

> 11.00; and cognitive limitations, mood disorders, and
> anxiety under 12.00. Nevertheless, there is no evidence
> that [Plaintiff]'s thyroid disorder would equal any of
> the above listings.

(Tr. 23.) The above-quoted language appropriately tracks the
Endocrine Disorders section for "[t]hyroid gland disorders," 20
C.F.R. Pt. 404, Subpt. P, App'x 1, § 9.00B.2 (italics omitted).
Moreover, the ALJ did not err in finding that "no evidence" existed
"that [Plaintiff]'s thyroid disorder would equal any of the
[thyroid-related] listings" (Tr. 23), as the record lacks any
evidence of blood pressure problems, cardiac dysfunction,
unintentional weight loss, or strokes (see Tr. 548-83, 818-21, 934,
1023-30, 1159-1231, 1246-66). With regard to mood disorders and
anxiety, as discussed in more detail below, the ALJ did not err in
finding that Plaintiff's depression and anxiety did not meet or
equal the requirements of Listings 12.04 and 12.06 (see Tr. 23-25).
In light of the foregoing analysis, the Court finds that the ALJ
committed no error with regard to his evaluation of Plaintiff's
hypothyroidism at step three.

e.  <u>Mental Disorders</u>

    Lastly, Plaintiff asserts that her "sever[e] depression and
anxiety" meet the requirements of unnamed mental disorders
Listings. (Docket Entry 17 at 4.) In support of that assertion,
Plaintiff notes that she "was hospitalized [in] August 2018 at Old
Vineyard Mental Health Clinic," and that "[a] combination of
[t]hyroid levels, an extremely [m]entally abusive marriage and

28

injury to her hand dominantly [sic] had contributed to her level of depression and anxiety." (Id.) Plaintiff further points out that "[s]he currently participates in [a] weekly stress and anxiety class at Daymark Recovery Mental Health Clinic" (id. (emphasis added)),[10] as well as that "[s]he experiences isolation, fatigue, and times of uncontrollable crying with depression, muscle aches in her right shoulder and neck, [and] tightness in [her] chest with anxiety" (id.).

The ALJ here apparently assumed without express analysis that Plaintiff's major depressive disorder and generalized anxiety disorder met the paragraph A criteria of Listings 12.04 and 12.06, respectively, and proceeded to analyze whether those impairments could meet or medically equal the criteria in paragraphs B and C of those Listings. (See Tr. 23-25.) Paragraph B of Listings 12.04 and 12.06 both require proof that the condition documented via Paragraph A resulted in at least "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

    1. Understand, remember, or apply information[;]

    2. Interact with others[;]

---

[10] Plaintiff's "current[]" participation in a weekly stress and anxiety class, i.e., as of October 19, 2022, the date she filed her instant Motion for Judgment (Docket Entry 17 at 4), does not relate to the period prior to the ALJ's decision on October 28, 2020, and therefore lacks relevancy to the Court's listings analysis.

3. Concentrate, persist, or maintain pace[('CPP'); and]

4. Adapt or manage oneself."

20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04B, 12.06B (internal citations omitted) (emphasis added).  In this context, to qualify as "marked," a limitation must "<u>seriously</u>" restrict the ability to function "independently, appropriately, effectively, and on a sustained basis."  <u>Id.</u>, § 12.00F.2.d (emphasis added); <u>see also</u> 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4) (explaining that "marked" represents the fourth-highest of five levels, below "extreme," but above "none, mild, [and] moderate"); and an "extreme" limitation means an individual has <u>no</u> "ab[ility] to function . . . independently, appropriately, effectively, and on a sustained basis," <u>id.</u>, § 12.00F.2.e.

The ALJ here found that Plaintiff's mental symptoms caused <u>mild</u> limitation in understanding, remembering, or applying information, <u>mild</u> limitation in interacting with others, <u>moderate</u> limitation in CPP, and <u>mild</u> limitation in adaptation/self-management (<u>see</u> Tr. 24-25) and, therefore, that "the 'paragraph B' criteria [we]re not satisfied" (Tr. 25).  The ALJ supported those findings with the following analysis:

> In understanding, remembering or applying information, [Plaintiff] has a <u>mild</u> limitation.  On mental status examination, thoughts tended toward depressive and anxious themes with mild depressive and anxious thought content ([Tr. 862]).  At a psychiatric exam, [Plaintiff]'s insight and judgment were poor ([Tr. 1137]).  However, [Plaintiff] reported that she did not need reminders to take care of personal needs and

30

grooming or reminders to take medication. She follows written and spoken instructions well ([Tr. 332, 335]). On mental status examination, [Plaintiff]'s thought process was coherent with good spontaneous production and cognitive flexibility, no tangentiality, and no rumination ([Tr. 858]). At another mental status exam, [Plaintiff] was able to spell the word TABLE backwards ([Tr. 885]). Accordingly, [Plaintiff] has a <u>mild</u> limitation in this area.

In interacting with others, [Plaintiff] has a <u>mild</u> limitation. At an appointment with her psychiatric physician's assistant, mental status examination revealed that [Plaintiff]'s affect was restricted with anxious range ([Tr. 847]). At another examination, [Plaintiff]'s mood was mildly depressed. Affect had mild restriction of range and reactivity ([Tr. 856]). However, [Plaintiff] goes to church, visits her parents, and visits her friends (Hearing Testimony). [Plaintiff] reported having no problems getting along with friends, family, or authority figures ([Tr. 335-36]). At the consultative examination, [Plaintiff]'s mental status was grossly normal ([Tr. 814]). Accordingly, [Plaintiff] has a <u>mild</u> limitation in this area.

With regard to [CPP], [Plaintiff] has a <u>moderate</u> limitation. At a visit with her psychiatrist, [Plaintiff] endorsed symptoms of hypo-activity, problems with concentration, impulsivity, racing thoughts, distractibility, and procrastination ([Tr. 848]). [Plaintiff]'s psychiatric physician's assistant observed that [Plaintiff] had increased motoric tone/activity. Speech was of elevated rate ([Tr. 850]).[11] At another mental status examination, [Plaintiff]'s speech was with mild soft and slow voice. She had mild slowing of movements ([Tr. 862]). [Plaintiff] reported that she could pay attention for about thirty minutes. She does not finish what she starts ([Tr. 335]). However, at another mental status examination, [Plaintiff]'s speech was normal in rate, tone, intensity and prosody. She was cooperative with normal psychomotor activity ([Tr. 885]). Accordingly, [Plaintiff] has a <u>moderate</u> limitation in this area.

---

[11] Those findings actually appear at page 4 of Exhibit 9F, i.e., page 849 of the administrative transcript. (<u>See</u> Tr. 849.)

As for adapting or managing oneself, [Plaintiff] has
experienced a <u>mild</u> limitation. [Plaintiff] has severe
anxiety and does not do well handling stress. She does
not handle changes in routine well, as she likes routine
([Tr. 336]). [Plaintiff]'s mother helps her with cooking
food, as it is difficult for [Plaintiff] to cut food
since she could not use her right hand. Her mother also
helps with lifting groceries, lifting laundry, preparing
meals, and rides to doctor appointments about five days
per week (Hearing Testimony). However, on mental status
examination by her psychiatrist, [Plaintiff] was well
groomed ([Tr. 852]). On psychiatric examination,
[Plaintiff]'s insight was good. She was capable of
independently caring for her [ADLs] ([Tr. 885]).
Furthermore, [Plaintiff] is able to drive a car. She
shops in stores. She is able to handle money. She goes
to church, watches television, reads, and watches YouTube
videos ([Tr. 333-34]). Accordingly, [Plaintiff] has a
<u>mild</u> limitation in this area.

(Tr. 24-25 (emphasis added).)

With regard to the paragraph C criteria, the ALJ found as

follows:

In this case, the evidence fails to establish the
presence of the "paragraph C" criteria. The record does
not establish that [Plaintiff] has only marginal
adjustment, that is, a minimal capacity to adapt to
changes in [her] environment or to demands that are not
already part of [her] daily life. There is no evidence
that [Plaintiff] requires significant psychosocial
supports or a highly structured setting. [Plaintiff]
stated that she is able to drive a car. She shops in
stores. She is able to handle money. She goes to church
([Tr. 333-34]).

(Tr. 25.)

As the above-quoted language shows, the ALJ carefully assessed

the degree of Plaintiff's limitations from her depression and

anxiety, and supported his findings with pinpoint citations to the

record evidence. (<u>See</u> Tr. 23-25.) Plaintiff has challenged

32

neither those specific findings nor the underlying supporting evidence (see Docket Entry 17 at 4; see also Docket Entries 2, 18), and the Court finds that substantial evidence supports the ALJ's step three mental findings. Accordingly, Plaintiff has not demonstrated error by the ALJ with respect to his evaluation of whether Plaintiff's depression and anxiety met or medically equaled the requirements of Listings 12.04 or 12.06.

### III. CONCLUSION

Plaintiff has not established grounds for relief.

**IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **AFFIRMED**, that Plaintiff's Motion for Judgment to Reversal (Docket Entry 17) is **DENIED**, that the Commissioner's Motion for Summary Judgment (Docket Entry 20) is **GRANTED**, and that judgment be entered dismissing this action with prejudice.


　　　　　　　　　　　　／s/ L. Patrick Auld
　　　　　　　　　　　　**L. Patrick Auld**
　　　　　　　　**United States Magistrate Judge**


September 8, 2023